The third case of the day, which is Wadley Crushed Stone v. Positive Step, No. 21-11-002. And we have Ms. Tidmore here for the appellant, Mr. Walter here for the appellee. Give you guys a chance to get settled. Ms. Tidmore, whenever you're ready. Good morning. May it please the Court, Emily Tidmore for the appellant, Wadley Crushed Stone Company. Your Honors, the primary issue in this appeal is the trial court's erroneous summary judgment ruling that a contract for the design, layout, engineering, equipping, and completion of a granite plant from the ground up on 740 acres of undeveloped timberland was a contract for the sale of goods within the Uniform Commercial Code as a matter of law. As this Court explained in its BMC v. Barth decision, this question of whether a contract is one for the sale of goods within the UCC  And it may be determined as a matter of law only where the contract is unambiguously for services, as in the City of Saco v. GE engineering case, which this Court discussed in Barth, where that involved a contract for the design and construction of an immovable structure, specifically a solid waste facility that needed to be able to process 500 tons per week of solid waste. And the Court in that case said, we can tell as a matter of law, this contract is for services. It's not for goods within the meaning of the UCC. On the other end of the spectrum is the Barth case, where this Court held as a matter of law that the contract was so clearly and unambiguously for goods because it involved specially manufactured machines, which were a piece of a larger plant, and not the whole plant itself, but a piece of it, movable machines. And this Court said, in that case, the contract is so clear we can tell as a matter of law. But in most cases, the issue is going to be one for the jury. This case, if anything, is closest to the City of Saco end of the spectrum. And that's because the contract here was for an immovable structure. I believe the Court could find as a matter of law that it was for an immovable structure, specifically for a granite plant that could produce 500 tons per hour of crushed granite. So can I ask you just a quick question? Because I think at a macro, macro, macro level, you're right that this was ultimately for a plant. But then once you begin to drill down into the weeds of the contract, it does seem like we're talking about lots of individual items, line items of equipment for which there were prices and delivery dates and all of this. So at that more granular level, it begins to feel a lot more about equipment than it does for services. I think you put your finger exactly on the issue. And that is, even if I believe that the record would support a finding as a matter of law that this was within the City of Saco type framework, it's for an immovable structure. But to the extent the Court disagrees and you say, well, this contract is kind of unclear, we can't tell exactly, that's exactly the point. You cannot determine from this contract as a matter of law. So it's a question, as Your Honor said, in BMC v. Barth, it's really in most cases, and this is certainly one of them, it's a question for the jury. And the trial court here narrowly focused improperly on the specific language of the contract when Georgia law very clearly establishes that we're to look at, and as this Court, as Judge Choufat, you did in the Barth case, look at the totality of the circumstances. Look at what was, we're not limited to the expressed terms of the contract. That's what first quality would have us do, and that's what the trial court improperly did. And in doing so, it overlooked numerous issues of disputed facts about the course of the party's proceedings here, about what was actually intended by the parties, about the services that were to be included in the contract and, in fact, were provided under the contract. And it's those very issues of disputed fact that make what the trial court did here erroneous, which was finding it was for the sale of goods as a matter of law, rather than what you should have done is saying that this was a question for the jury. So let me ask you just another quick question. I think impressionistically or atmospherically for your side, the most difficult fact to contend with is like the percentage, right? This 95.7 percent number, you know, it's a headwind, right? And so what's the answer to that? I think the answer is very clearly that that number is not supported by the record when you look at the entire record. So if you look solely at the face of this, you know, line-itemed document that was signed by the parties, by one party, if you look at that, you say, oh, it's 95 percent equipment, it's 5 percent services. And that's what the court very much laser focused on. The problem with that is the evidentiary record shows that that does not include, for instance, the $91,000 commission that First Quality received from Gaston Construction. So that's $91,000 that's totally taken out. A second that's not included in that 95 versus 5 breakdown at all. In addition, the record is very clear. First Quality's 30B6 witness, Mr. Curley, testified that the line items listed on the contract are not solely for equipment. That was how he was paid for the hundreds of emails, countless and countless hours that he testified about that he and his company spent on this project. They were paid for that through markups in those line items. And he also testified that in determining the price for this project, he didn't actually look at each line item. He looked at the project as a whole. He testified about this in his deposition. He looked at the project as a whole and said, what do I, what does First Quality need to make on this contract? What do we need to make on this project? And so the 95 versus 5 breakdown really just is inaccurate as a matter of the record in this case. That is not what the actual breakdown of price of equipment versus price of services is. And the actual breakdown is unknown because when First Quality was asked about it in his deposition, Mr. Curley refused to provide any information about what the actual markup on the equipment was. So we don't know. And as the party arguing for the application of the Uniform Commercial Code, the burden is on them to prove what that breakdown was. We don't have any evidence of that in the record as it stands. And so that's a disputed issue that the jury would need to resolve after hearing testimony on it. And it can determine how much of this contract actually was for equipment versus how much of it actually was for services. So your point, I guess, is that like when we said in BMC that, you know, when the charge for goods exceeds that for services, the contract is more likely to be for goods. Your point is, look, 95.7 percent, that's not supported by the record. You don't claim necessarily that you could get it south of 50 percent, that you could sort of re-crunch the numbers to get it south of 50. Your point is just that, like, we have no idea. We don't know. Fifty percent is not a magic number. As courts have recognized, this is a contract, and that kind of goes back to the fundamental point. This is a contract for the design and construction, not of a piece of machinery, movable machinery as in the Barth case or, you know, specifically specially manufactured machinery, which is expressly covered by the Uniform Commercial Code, but that this is for the whole plant. And it really contemplated design, layout, construction of a plant. And courts have recognized that when you have that kind of a contract where it's for this, it's for an immovable structure, if you just look at price, almost every contract like that, the price is going to outweigh the amount of the services. We're talking about long-term. I mean, the pieces of equipment here have 20-year lifespans at a minimum. And so, you know, these are expensive pieces of equipment, but the services that were provided here were the important thing of how do we get to a plant that can produce 500 tons per hour? How do we lay that out? How do we put all these pieces together? So, yes, the price in a contract like this should not be determinative, but at a minimum, we don't know what the actual breakdown was, and so that is a jury question. Do you want to address the counterclaim issues before you sit down? Your Honor, I'd be happy to. I think in those counterclaim issues, I think the important thing to remember, I think it's important and helpful to understand them if we take a step back and consider the fact that the gist of what Wadley was alleging and asserting in its responses to First Quality's counterclaim, the gist of its defense was always clear and has always been consistent throughout, from the answer in the opposition to summary judgment, in its motion for reconsideration, and on appeal, and the gist of that defense is that Wadley is not required to pay First Quality's additional invoices because it has claims against First Quality and damages that it suffered as a result of First Quality's own breaches arising from the same transaction and occurrence which caused Wadley damages. First Quality clearly understood that defense in its motion for summary judgment where it described it and it understood it perfectly. It said, their purported justification for refusing to pay the invoices at issue in the counterclaim is positive steps breach of contract alleged in Wadley's complaint. So the actual defense has always been clear and has been understood by the party. And the trial court erred in granting summary judgment against Wadley on its defenses because it narrowly limited its consideration to set off under Alabama Code 6880 and said, well, you don't have a judgment, so therefore you can't have set off. And that is just very clearly incorrect as a matter of Alabama law. It's very clear that where claims arise out of the same transaction, those claims, Alabama policy desires for those claims to be brought together. There is no statute of limitations that applies to that claim in the nature of recoupment to that defensive claim. And so by first quality filing that counterclaim, Wadley is permitted under Alabama law to assert its defensive claims, which are in the nature of recoupment for breach of contract, breach of the implied warranty. All those claims have the same gist, which is we have claims against you, and so therefore we don't have to pay your invoices. I guess the difficulty for me, and I think anyway, and I'm not asking you to throw anyone under the bus, but I think I understand that you were not handling this at the trial, but it seems like the theories that we're being sort of pitched now were really first sort of, they made their first real appearance in the motion for reconsideration on the summary judgment motion, at which point the case began to sort of take on a new life. And I guess I just wonder, I mean, it seems like in the op, there was really, both in the answer, I think, and in the op, there was a defense, you know, in the nature of set off, and then now citing a specific statute, as I recall, and now you're saying that the district court abused its discretion in refusing effectively to recharacterize that as a counterclaim for recoupment. I'm so glad you asked, Your Honor, because I think that's actually not true. So if you look at the answer, it is not limited to a defense. Paragraph 2 of the answer specifically says, for the reasons stated in the Fourth Amendment counterclaim, Wadley claims a set off as to outstanding invoices in excess of the amounts claimed by first quality. So it was not limited solely to a defense. It was asserting these defensive claims that are recognized under Alabama law in the nature of recoupment. It did not use the word recoupment, but Alabama law is clear in the finish line case that the term, there's so much confusion about the terminology set off or recoupment, so the fact that they said set off rather than recoupment, that's not determinative. So what about the fact in the op that you said you would be entitled to a set off if first quality's motion for summary judgment on your claims is denied? Yes, Your Honor, and that goes to something else you said in your earlier question, which is that Wadley was the one that cited Alabama Code 6880. That is not true. That was not cited in the answer. It was raised in the opposition to summary judgment, but that was really in the context of first quality concedes that if it loses on its summary judgment on the UCC issue, then we are entitled to a set off under Alabama Code 6880. And interestingly, trial counsel for Wadley also at that time cited the Georgia statute 1375, which relates to these types of issues and when claims may be brought against each other. So even in the opposition to summary judgment, it wasn't limited to 6880, and that was part of the manifest error of law that the trial court, I think, committed here, is limiting the analysis to 6880, which says you have to have a judgment, and that simply is incorrect as a matter of law. In addition, in the opposition to summary judgment, Wadley also raised the breach of implied warranty. So it said, okay, on the one hand, if you grant the summary judgment on the UCC issue, or if you deny the summary judgment on the UCC issue, then they have conceded we have this right to set off. In addition, if the UCC applies, then we have this breach of implied warrant, then the UCC necessarily also has to apply to your claim, counterclaim, which arises from the same transaction and the same dispute as they had vehemently argued. And so if the UCC applies, then we have a similar justification for not paying. It says that in that section. It says we are justified in not paying because we have claims based on your breach of the implied warranty. So the nature of the defense is the same. The specific context in which it's raised there, and even in the answer, I would argue that the claim of set off in the answer is broad enough to encompass that breach of implied warranty claim brought as a defense. And as Judge Hull, as you said in the Proctor v. Floor case, in a case like this where the defense is not pleaded in the answer, but it's not one of the enumerated defenses in Rule 8c and one of those 19 enumerated affirmative defenses and where it is raised in the opposition to summary judgment and where it's arguably even raised in the answer implicitly, it's an abuse of discretion for the district court not to consider notice and prejudice to the party. And here, first quality in the trial court never even said word one about whether there was notice or prejudice. I think that's because there is not any. There was clearly notice from the opposition to summary judgment, and there's no prejudice because discovery had been limited to the statute of limitations issue at their request. So simply holding that based on waiver and the fact that it wasn't raised in the answer is an abuse of discretion. Okay. Very well. Thank you, Ms. Tidmore. You've got the full three minutes of rebuttal remaining. Mr. Walter, we'll hear from you for 15 minutes. Thank you, Your Honor. Jim Walter. I'm here on behalf of Positive Step, Inc., doing business as First Quality Equipment Company. I would like to emphasize three main points that support the affirmance of the district court's orders in this case. First of all, the modified contracts provisions clearly established it is predominantly for the sale of goods. And in the BMC Industries versus Barth Industries case authored by Judge Choflat, he made clear that the contract was the starting point for the analysis. Wadley has, throughout this case, once the UCC statute of limitations issue arose, has tried to avoid discussion of the contract. That is, according to the BMC case, the starting point of the analysis. The second point I'd like to address is even accepting as true Wadley's arguments that Ms. Tidmore just made regarding markups and additional service charges, the record reflects that the sale of equipment still accounts for over 70% of the total contract price. So help me. You're more familiar with the record than I am, but I guess I took from my colloquy with Ms. Tidmore that once we get off the 95.7, there's just sort of like no way to know what the real number is. So how do we get to the 70% number that you're talking about? Thank you, Your Honor. The way we get to the 70% number, we start out with the contract terms, which provide that over 95% of the price is for specified for 25 items of equipment and less than 5% is for the two services listed in the contract. Then accepting Wadley's argument and giving it the benefit of all doubt, the $91,000 commission payment that they say that First Quality received from Gaston Construction Company, even if that is factored in as a service, that moves the needle by two points. The service goes from 5% to 7%. 93% is still for equipment. The remaining portion of their argument relates to markups, and that is in the record is perhaps not as clear because that has been marked as confidential by the parties. And those records relating to markups, I would invite the court's attention in the appendix seal documents to document 112-50, document 112-65, document 112-70, and also this is in the appendix. This is not a confidential document. It's a statement actually made in one of Wadley's trial briefs or summer judgment briefs to the district court document 113 at page 6, and it's paragraph 44. And those documents reflect that First Quality's markup percentage on the equipment that it sold to Wadley ranged from 5% to 20% depending upon the items and equipment. So again, Judge Newsom, accepting this argument is true, that markups should be considered solely as services. Accepting their apparent argument that First Quality was entitled to absolutely no profit based on the equipment that it sold to Wadley was entitled to no coverage for overhead based upon the equipment it sold to Wadley. Instead, this was all considered hidden payments for services. That puts the total services percentage to 26% and it puts the propensity for the sale of equipment to 74%. And again, that's accepting Wadley's argument is true and drawing all inferences in its favor. And would that be, so let's assume that we're at 74, would that be enough under our law to say as a matter of law we can hold that this is a goods contract and not a services contract? Thank you, Judge Newsom. And that's precisely the next point I was going to make is that even accepting their argument is true and providing all of the inferences in their favor, 74% is significantly higher than the 50% to 65% equipment percentages in the BMC case, which is this court's case, and also in the two most analogous Georgia cases, the Zordic case and the Scandinavian House case. In BMC, Judge Choflat found that I think slightly over 50% of the contract price was for equipment. In the Zordic case, the court found that it was at least 50%, but it appeared it was in the 50% to 60% range. And in the Georgia Scandinavian House case, the equipment percentage was approximately two-thirds, so 60% to 65%. So even accepting Wallace's argument is true, providing all inferences in its favor, the 74% equipment percentage under the undisputed terms of this contract is higher than the percentages found by this court in BMC, by the Georgia courts in Zordic and Scandinavian House to be predominantly for the sale of goods as a matter of law. And Your Honor, if I could go to another point I wanted to make concerning the modified contract's language. The terms of the modified contract clearly reflect the sale of goods under the predominant factor test recognized in the BMC Industries case and also by the Georgia courts in the Zordic and Scandinavian House case and in several other cases cited in our brief. First, the contract calls itself a quotation. In addition, the terms selling price, equipment, and purchase order were found in the quotation that became the modified contract. Those are all terms commonly used in the sale of goods as Judge Choflat found in the BMC case. Second, and this has already been discussed, 25 of 27 line items are for specified items of equipment with sale prices for each one of those specified items of equipment. Many of those items of equipment are specially made, specially fabricated by the manufacturer at its plant. All of those pieces of equipment were shipped from other states or countries to the job site in Alabama. In addition, Wadley was responsible for the payment of all freight charges from the equipment's point of manufacturer, and Wadley was also responsible for all states and local taxes on the equipment. Fifth, the payment was due to first quality from Wadley 10 to 20 days after delivery of the equipment, and that's critical in this case. Again, following the BMC Industries case, as this court observed in BMC Industries and as the district court observed in finding that this was predominantly a contract for the sale of goods, and I'm paraphrasing Judge Schoflat's opinion of BMC Industries, if the contract price were being paid predominantly for first quality services, as Wadley claims, then the parties would have paid payment to the completion of those services, not to the delivery of the equipment, as is the case under this contract. And then sixth, but not least, the modified contract did not require first quality to install the equipment. Instead, Wadley decided to modify the initial contract to remove the installation, erection, and electrical work from the scope of first quality's contract and to instead contract directly with Gaston Construction Company and paid Gaston Construction Company directly over $1 million for those services. In sum, the modified contract has all of the hallmarks of a contract for the sale of goods governed by the UCC. Can you, and maybe you're making this pivot now, but can you also talk about the counterclaim issues? Yes, I'll be glad to. And I take the thrust of Ms. Tidmore's point to be that we may be, maybe we're being a little too formalistic here about sort of how these defenses and our counterclaims got raised, articulated, but as she says, the gist was there from the beginning. Everybody knew sort of what was in play. Well, Judge Newsom, I think your comment was right on point, that after the district court entered summary judgment in this case, Wadley retained new counsel, and even before Ms. Tidmore's firm was retained, subsequently, the new counsel filed a motion for reconsideration that raised all new arguments to the extent it claimed that some of the arguments had been raised prior to summary judgment. Those were just repackaged versions. It claimed it was a new argument, but it was not. Specifically, Wadley did not raise its recoupment, non-statutory right of set-off, and statute of limitations arguments prior to the district court's rulings on first qualities counterclaim for unpaid invoices. And this court has long held, recently in the Corley versus Long-Lewis case, the district courts act well within their discretion when they refuse to consider arguments that a party made for the first time in a motion for reconsideration. With respect to the UCC implied warranty argument, they did raise the UCC implied warranty argument in response to the motion for summary judgment with respect to unpaid invoices. However, that was not pled in the answer. In addition to that, Wadley expressly disclaimed that defense by affirmatively stating in its response to first qualities motion to dismiss fourth amended complaint that, and I'm quoting directly from Wadley's brief, Your Honor, no claim is being asserted for breach of any implied warranties under the UCC. And that disclaimer of the implied warranty defense is found at document 73 at page 9. So with respect to Ms. Tidmore's argument, and she referenced Judge Hull's decision in the Proctor versus Flory Enterprises case. This case is very different from the typical case, including the Proctor case where a party says that there were some earlier pleadings that should have given the other party notice that a defense was being raised or there was implicit notice based upon things that had already been argued. This is the polar opposite of that. This is a case where the implied warranty defense had not only been left out of the answer, it had been specifically disclaimed by Wadley prior to the summary judgment stage. So obviously, First Quality did not have notice of the implied warranty defense that Wadley expressly disclaimed. And with respect to prejudice, First Quality was prejudiced because it proceeded the summary judgment without the opportunity to take discovery on the implied warranty defense based upon the fact that it wasn't alleged in the answer and that it had been specifically disclaimed prior to the summary judgment stage. Mr. Walter, thank you very much. Thank you, John. Ms. Tidmore, you've got three minutes remaining. And you probably are anticipating this, but can you respond as best you can to Mr. Walter's argument that there, in fact, is record material that would allow us to get to 74% and that that 74% is good enough as a matter of law for us to conclude that this is a good time to act? My first response, Your Honor, would be that's the first I'm hearing of this at all. I have read this whole record. It certainly was not apparent to me that that's what those documents were. And I would note that First Quality has not ever said that in the trial court, in its appeal brief in this court. It's never said, oh, it's actually 70%. We've made the arguments that this 95-5 breakdown is wrong. And First Quality, this is the first time that it's mentioned that. So, I mean, to the extent I would ask the court for the opportunity to submit a supplemental letter addressing that after the hearing, if it desires me to do so. I don't feel like I have had a fair chance to respond to that. Yeah, I mean, it might be fair, really, just to allow both of you to, and you can stop the clock if you want to for a minute, to allow both. To me, anyway, this is an important piece of the record. And so it might be fair to allow both of you to address it. And I guess we'll send out a notice, but just so you're aware, it'll be something, simultaneous briefing, probably not to exceed five pages within so-and-so. But we'll have an order sent to you. The other point that I would make on that, Your Honor. Okay, so here we go, clock back. And the other point that I would make on that, Your Honor, is, I mean, I actually think it, if anything, it helps Wadley. Because he, they basically are conceding, well, it's, you know, taking the facts in light most ever favorable to Wadley, as we're required to do at summary judgment, the number's actually more like 74%. So this 95-5 breakdown, I mean, he's admitting this is not actually true. Except, I guess, his point would be, well, I mean, I can make that concession in good conscience because BMC says 50 to 65 is good enough or whatever. Yeah, and BMC also says no one factor is predominant. I think that's elevating the price factor above the other factors in an improper way that is not called for by the case law. It's certainly not called for in Georgia law, where it says we look at the totality of the circumstances. It's a factor. But in this case, it's an error to elevate it, too, because there are, I mean, I think both the trial court and first quality have lost sight a little bit of the question that's really at issue in this appeal, and that was at issue at the summary judgment below. The question is not, is this a contract predominantly for goods or is this a contract predominantly for services? The question is, is there sufficient evidence from which a reasonable jury could find that this is a question predominantly for services or that it's really a contract for an immovable structure so it actually doesn't even involve goods at all? There were goods that went into the creation of this immovable structure, this plant, and I think if the court were to look at something that helped me in trying to understand this is looking at the photos of the plant, which are exhibits 4 through 7 to Mr. Donohue's deposition. It's at 112.18 to 112.21. It shows you the scope of what we're talking about, the scope of the reason why Wadley needed first qualities, expertise, and knowledge, and that that's what it was really contracting for, of how does this fit together? How do we get the granite pulled out of the ground in this place, moved over to here, crushed, processed as it needs to be? And that was really the predominant purpose. Certainly there is substantial evidence in the record from both Mr. Curley from first quality showing that the predominant purpose, and from Wadley, showing that the predominant purpose of this contract was to get a 500 ton per hour plant. I see that my time has expired if I may just briefly wrap up. You can wrap up, sure. I agree with Mr. Walter that the contract is the starting point. Where I disagree with him is to say that it is so clear as a matter of law. If you look at the very first line of the contract, it says that it is a contract, a quotation for a 500 ton per hour granite plant. He says, oh, it talks about selling price. Well, if you look at the whole thing, it says total plant selling price. So at best there is a, I would say, again, as I said, I think this doesn't even involve an immovable structure, not movable goods within the UCC. But you can look at this contract and the record evidence and the totality of the circumstances and say that there is not a jury question there. Can I ask something? You said in your opening that they included in markup, even though the line items say piece of equipment say $80,000, you said your client testified there was a markup in that that covered the services. What was the scope of the markup? Was it 5% over the line items, 10%, 20%? What was the scope of your client's testimony as to the markup? They did own the equipment to cover the services. Our first quality was asked that in his deposition, and their 30 B6 representative, Mr. Curley, said, I can't recall. I don't know. I don't know what our profit was on that. I don't recall what the markup was. He refused to ever give an answer on that. Mr. Walter has come up here and said that there's documents in the record. First time ever he's said that there's documents in the record showing that that brings it down to 75%. I don't know if that's true. So that's what we're going to. So they never testified as to what the markup was. Correct, Your Honor. Okay. And you don't know these documents under seal, what they show? I mean, I have seen the documents. We submitted them. They're part of the record. We submitted them as part of the sealed appendix. But I certainly didn't read them. What are the documents? I'm not actually sure, Your Honor. Okay. He has never pointed these out as showing that these show this markup amount. Okay. Beautiful. Thank you both very much. Did you have another question, Judge? No. Very well done on both sides. Thank you so much. We'll submit that case and move on.